Filed 5/13/24  Skouti v. Buttonwillow Warehouse Company CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| AHMAD SKOUTI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BUTTONWILLOW WAREHOUSE COMPANY, INC. et al., <br><br> Defendants and Respondents. | Consolidated Cases Nos. F084773, F085073 <br><br> (Super. Ct. No. 20CECG01971) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Whitney, Thompson & Jeffcoach, James B. Betts; and Daniel C. Stein for Plaintiff and Appellant.

Petrie Leath Larrivee & O'Rourke and Sean T. O'Rourke for Defendant and Respondent Buttonwillow Warehouse Company, Inc.

McCormick, Barstow, Sheppard, Wayte & Carruth and Todd W. Baxter for Defendant and Respondent James Britton.

-ooOoo-

This is a consolidated appeal from June 14 and September 19, 2022 judgments of the Fresno County Superior Court entered on orders granting summary judgment motions in favor of defendants and respondents James Britton and Buttonwillow Warehouse Company, Inc. (Buttonwillow), respectively. Specifically, the court found plaintiff and appellant Ahmad Skouti did not file a timely lawsuit. Skouti contends defendants "should have been equitably estopped from obtaining summary judgment based upon the statute of limitations."

We conclude there was a triable issue of material fact as to whether equitable estoppel disallowed a statute of limitations defense. Accordingly, we reverse the judgments.

## FACTUAL AND PROCEDURAL HISTORY

Skouti, who farms Thompson raisin grapes, entered into an oral agreement with defendants for their farming consultation services and to purchase fertilizers, pesticides, and other agricultural chemicals for his vineyards. In the summer of 2016, Britton applied a tank mix of chemicals to Skouti's vineyards under Skouti's supervision. By the end of July 2016 or the beginning of August 2016, Skouti became aware of spray damage to his vines, which "showed signs of chemical burn, including yellowed and damaged leaves, canes and fruit." Skouti "promptly gave notice to Buttonwillow and Britton of the spray damage to his Thompson raisin grape farms." Britton "said he was going to help Skouti get compensation for his losses . . . ." Skouti "agreed to allow Defendants to inspect his vineyards along with representati[ve]s of the chemical manufacturer(s) who supplied the contaminated farm chemicals that caused [his] crop damages." Defendants "arranged for one of the chemical manufacturers who assertedly caused [Skouti]'s 2016 crop damages to visit and inspect [his] fields." Skouti "worked to encourage Defendants to honor their promise to pursue reimbursement from the chemical manufacturers they told [him] were responsible for this damage." At the end of 2017 or the beginning of 2018, sometime after Skouti returned from a trip to Syria, Britton "started avoiding

2.

Skouti." Britton "never asked Skouti not to sue him" and—prior to 2019—"told Skouti that if Skouti has to, to sue him." In addition, Skouti could not "remember ever being asked not to sue Buttonwillow." Skouti "did not initiate litigation of his 2016 crop loss claim until July, 2020 . . . ."[1]

In a "COMPLAINT FOR DAMAGES" filed July 8, 2020, Skouti raised causes of action for breach of contract and negligence against defendants. Skouti alleged: (1) "the application of the tank mixes of materials recommended by Defendants damaged the vineyards, destroyed a substantial portion of [his] crops and inflicted heavy damage to the vines"; (2) he "discussed with Defendants his possible assertion of a claim for damages"; (3) defendants "advised [him] that the crop damage he experienced was due to a manufacturers' defect in the agricultural chemicals they recommended and sold to [him]" and "further represented that they would work with the product manufacturers to obtain compensation for [his] loss"; (4) defendants "sought to, and did, dissuade [him] from purs[u]ing a damage claim against them" "[b]y making this representation to [him]"; and (5) defendants "apparently never pursued any claim for product defect." In their answers, defendants invoked various statutes of limitations, including Code of Civil Procedure[2] sections 338 and 339.

Buttonwillow and Britton filed summary judgment motions on November 12, 2021, and January 7, 2022, respectively. Both maintained Skouti's actions were time-barred. In his oppositions to these motions, Skouti asserted defendants were "estopped from asserting a statute of limitations defense." (Boldface, capitalization & underlining omitted.) In an attached declaration, he averred:

> "2.      I have been, and am, the owner of 15 properties upon which I farm approximately 563 acres of Thompson raisin grapes. For the last 40

---

[1] The facts set forth in this paragraph are taken from the parties' separate statements of undisputed facts. (See Code Civ. Proc., § 437c, subd. (b)(1) & (3).)

[2] Hereafter, subsequent statutory citations refer to the Code of Civil Procedure.

years I have been, and am, actively involved in all aspects of the farming and management of the individual farming properties that I own. I have worked closely with my brother, Walid Skouti, over the last 36 years, during which time he has assisted in the farming and management of these properties. . . . [¶] . . . [¶]

"4.     Although my brother and I are U.S. citizens and can speak English, we were both born in Syria, and English is our second language. As such, our English is heavily accented, and it is difficult at times for us to communicate with others. We also have difficulty reading English. Although we can recognize English words that we see frequently, such as local street names, it is difficult for us to read in English. We are fluent in speaking, reading and writing in Arabic.

"5.     Over the last 40 years, I have entered into several agreements with farm chemical companies to sell me agricultural chemicals needed to farm my ranches as well as to provide Pest Control Advisors ('PCA') to supervise and inspect my ranches and to recommend the application of different farming chemicals. In each instance, I was aware, as a result of my work with these individuals and entities, that the PCA's we utilized worked as employees or agents of our farm chemical suppliers, and in exchange for the provision of PCA services I agreed to purchase all of my farm chemicals from that particular supplier. For example, when I began to purchase farming chemicals from Buttonwillow . . . in 2008/2009, it appointed one of its employees, James Britton, to work as my PCA.[3] In return, I agreed to purchase all of the farm chemicals he recommended exclusively from Buttonwillow. Based upon my 40 years in farming, I know that this is a standard practice in my industry for purchasing farm chemicals and securing the services of a PCA.

"6.     Given the limitations that my brother and I have in speaking, reading and writing in English, we were, and are, highly dependent on our farm chemical suppliers and PCA's to, among other things, recommend the application of agricultural chemicals and to assist us in preparing the tank mixes of materials to be applied to our vines. Our farm chemical supplier and PCA are critically important to our success, because without a farm chemical supplier we can not purchase or apply restricted agricultural chemicals. Simply stated, without them we could not farm for very long.

"7.     Based upon my work for over 40 years in farming, I am aware of the fact that farmers who sue or assert damage claims against their

---

[3] On the other hand, Buttonwillow denies employing Britton.

4.

farm chemical suppliers and/or PCA's in the Central Valley of California face great difficulty in hiring replacements. Over the years that I have farmed raisin grapes in the Central Valley, I have had disputes from time to time with my agricultural chemicals suppliers. Based upon my personal experience, I know that farm chemical suppliers and PCA's are hesitant to work with farmers who have pursued such claims. Specifically, I struggled to find a replacement farm chemical supplier after I pursued a lawsuit against [a farm chemical supplier] for spray damage to my vineyards in 2002, and on a second occasion after I pursued a lawsuit in 2006 against [another farm chemical supplier] for spray damage to my vineyards. Specifically, when I advised potential chemical suppliers of the reason that I was looking for a new provider, they declined to do business with me. [¶] . . . [¶]

"9.     After speaking to a number of chemical suppliers who declined to work with me, I was finally able to retain Buttonwillow in approximately 2008-2009, to provide me with farming chemicals. Pursuant to that agreement, Buttonwillow's Manager, Russ Patterson, assigned one of its employees, James Britton, to serve as my PCA. In return, and as is normal in our industry, I promised to, and did, purchase each and every farm chemical that I needed for my ranches from Buttonwillow until it terminated our relationship in 2020. [¶] . . . [¶]

"13.     Throughout our relationship, Buttonwillow continued to direct and control the PCA they had assigned to work on our farms. For example, after our spray damage in 2016, I was advised on 2 or 3 different occasions by representatives of Buttonwillow, including its manager Brad Crowder, that it was going to replace Mr. Britton and assign a different PCA to our account. However, Buttonwillow unilaterally terminated our business relationship before this occurred. Additionally, although Buttonwillow normally delivered the agricultural chemicals that their assigned PCA recommended and I purchased, Mr. Britton would also pick up and deliver those farm chemicals to us from time to time. In or about 2018, Buttonwillow declined to allow Mr. Britton to pick up or deliver farm chemicals that I purchased from Buttonwillow. Also, I was present at a meeting with Buttonwillow's manager, Mr. Crowder and our assigned PCA, Mr. Britton in 2019, when Mr. Crowder directed Mr. Britton to continue his efforts to pursue recovery for our damages from the responsible chemical manufacturer. [¶] . . . [¶]

"14.     In or about August, 2016, our then assigned PCA, Mr. Britton recommended and we applied, a tank mix of agricultural chemicals that I purchased from Buttonwillow to all of my raisin vineyards. In the weeks

that followed that application, my vineyards began to show obvious evidence of chemical spray damage. The damage that I observed continued to progress throughout the end of the growing season and into harvest, and manifest itself as burnt dead leaves, burnt canes and prematurely shriveled, burnt grapes and dead vines. I have experienced spray damage to my fields on multiple occasions, including 1994, 2002 and 2005, and am familiar with the observable effects that it causes. The damage I observed in 2016 was clearly spray damage because it promptly caused burnt leaves, canes, fruit as well as burnt dead vines. Spray damage was also evident from the fact that [i]t appeared on both young and older vines and similar damage appeared to affect all of my Thompson raisin grape vineyards.

"15. Upon observing the spray damage to my vineyard, I promptly apprised Buttonwillow and Mr. Britton of what I had seen. I walked several of my vineyards with Mr. Britton, and we jointly observed the burnt leaves, canes and fruit. Almost immediately, Mr. Britton advised me that the vines had chemical spray damages which he believed was caused by some form of contamination in the agricultural chemicals that were applied. I have no training in farm chemicals, and can not even read the product labels for the agricultural products we purchase and apply. Thus, I had no reason to doubt his analysis of the cause of my damages. Mr. Britton further represented to me that he would follow up with the chemical manufacturers to try to ascertain what had happened, and to obtain compensation for my losses. In connection with his efforts, I consented to Mr. Britton bringing representatives of the potentially responsible chemical manufacturers to the ranches to view the damage. It was my understanding that Mr. Britton did so, although I was not included in those inspections and was never advised of any results reached as a result of any inspections that he conducted with representatives of those farm chemical manufacturers.

"16. As a result of our field visits and conversations we had in late 2016, I provided Mr. Britton with a two volume set of photographs which depicted evidence of spray damage in my vineyards. After Mr. Britton represented that he would contact and negotiate with the chemical suppliers who caused my damage, he asked me for, and I gave him, two duplicate volumes of those photographs to provide to the manufacturers in order to support my claim for damages.

"17. At the conclusion of the 2016 crop year, in either late 2016 or, early 2017, I also met with Buttonwillow's manager, Russ Patterson, and Mr. Britton to discuss several issues, including obtaining compensation for the spray damage I had suffered. In that conversation, Mr. Patterson reiterated that our assigned PCA, Mr. Britton, would pursue compensation

6.

from the farm chemical manufacturing company that had supplied the contaminated materials. In fact, in the 2016 crop year, I began to fall behind on some of my farming bills, and we discussed in that meeting that amounts that I owed to Buttonwillow (approximately $50,000.00 at that time) would be paid out of any settlement they negotiated with the manufacturers whose chemicals caused my damage. . . . [I]n our meeting in late 2016 or early 2017, Mr. Patterson agreed that Buttonwillow would essentially finance me in the upcoming crop year by continuing to sell me farm chemicals despite my outstanding balance.

"18. During my conversations with both Mr. Patterson and our assigned PCA, Mr. Britton, in late 2016 and/or early 2017, they commented on the fact that I had essentially run out of chemical supply companies that I could hire to obtain agricultural chemicals. Their comments were impactful to me, as I clearly understood them to say that if I pursued a claim against them, they would withdraw as my farm chemical supplier and PCA. Based upon my knowledge of the farming industry, and my personal experience after suing my prior suppliers, I knew that such a result would be potentially fatal to my ability to farm. However, since they told me that my crop damages were the result of 'contaminated' chemicals, and that they would pursue, and were pursuing, compensation for me from the responsible manufacturers, I relied upon their representations that they were not responsible for my damage and that they were actively pursuing a damage claim with the responsible chemical manufacturer such that there was no need for me to file a lawsuit at that time.

"19. In early 2017, I returned to Syria for several months to address family issues including matters arising out of the civil war and continued armed conflict there. I returned to Fresno in late 2017, or early 2018. During my absence, my brother, Walid Skouti, continued to manage our farms, and we spoke regularly.

"20. From 2016 to 2019, my vineyards continued to struggle as a result of the spray damage sustained in 2016. Although I had hoped that my vineyards would recover over time, it was becoming increasingly obvious that the vines are not improving. Thus, I met with Buttonwillow several times in 2018, with Russ Patterson's replacement, Brad Crowder. In our discussions, Mr. Crowder advised me that Mr. Britton would continue his communications on my behalf with the chemical companies responsible for my damage and that any resulting settlement would be used, in part, to bring my account with Buttonwillow current.

"21. Early in the 2019 crop year, I met again with Buttonwillow's general manager, Brad Crowder and Mr. Britton in Bakersfield, California.

7.

Once again, the purpose of our discussion involved their continued efforts to obtain recovery for my damages from the chemical manufacturers whose products damaged my crops, to discuss the value of my losses, as well as our continued difficulty in staying current on our bills. In our discussions at that meeting, Mr. Crowder told me that Buttonwillow would 'set aside' the current delinquent amount of my debt and directed Mr. Britton in my presence to continue his discussions with the chemical manufacturers and attempt to negotiate a reimbursement for my losses. At the conclusion of that meeting in early 2019, and because this matter appeared to be dragging on without resolution, I insisted that Buttonwillow document our discussions in writing. In response, following our meeting I received correspondence from Mr. Crowder dated May 20, 2019, in which he confirmed certain limited aspects of our discussion, and noted that: [¶] 'In addition, Mr. Skouti's independent PCA James Britton will contact that manufacturer and look into any possible reimbursement.'[4] [¶] . . . [¶]

"23. During this same period (2018-2019), and in our meeting in early 2019, both Buttonwillow and Mr. Britton continued to reference the difficulties I had obtaining farming chemicals following my earlier crop loss lawsuits and that I needed to be careful or I would find myself without a chemical supplier. Consequently, I knew that I was in a very difficult situation, as if I had a conflict with either Buttonwillow or our assigned PCA, it was entirely possible that I would not be able to replace them. This left me in a difficult position, as I was relying on their promise to pursue crop damages against the manufacturers on my behalf, and I did not want to risk losing my ability to obtain farming chemicals. Moreover, both Buttonwillow and Mr. Britton continued to claim my damages on contaminated chemicals having been applied to my vineyards.

"24. By early 2020, my situation had become more dire, and it was becoming apparent that neither Buttonwillow nor Mr. Britton appeared to be honoring their promise to pursue compensation from any chemical manufacturer for my damages. As a result, on January 31, 2020 I wrote to Buttonwillow to state, in part: [¶] 'In response, Buttonwillow repeatedly represented that it would work to present a claim on our behalf to the chemical manufacturers, and to work with us on our invoices. In fact, I met with you on multiple occasions to discuss Buttonwillow's promise to pursue our claim with these companies. Due to your representations to help us recover from our losses and our relationship with Buttonwillow, we did not immediately pursue any claim arising out of our losses from the 2016 crop year. [¶] At this point, Skouti Farms does not have the resources to

---

**4** This letter was attached to Skouti's declaration.

pay our current account. Instead, we will continue to rely in good faith on Buttonwillow to keep its promise, and to assist us to recover for our losses. In the meantime, we will continue our current practice of providing cash payments for our future purchases.'[5] [¶] . . . [¶]

"25. I received no response to that correspondence. However, shortly thereafter, Buttonwillow terminated our relationship. This was true even though for the past year I had been paying for all of my purchases from Buttonwillow at the time of purchase. Thus, there was no reason for Buttonwillow to terminate our relationship at that time. Following Buttonwillow's termination of our relationship, Mr. Britton was unable to or declined to arrange for our purchase of farming chemicals through any other source.

"26. From the Fall of 2016 to 2020, I knew that I had a potential claim for the spray damage to my vineyards. However, I did not immediately file suit because I was relying upon Buttonwillow and Mr. Britton who repeatedly told me:

> "a) The crop damage was caused by contaminated chemicals provided by one or more chemical manufacturer;
>
> "b) They were pursuing recovery for my claim from the responsible manufacturer;
>
> "c) If I made a claim against Buttonwillow or Mr. Britton, they would stop doing business with me and I would be unable to replace them.

"I did not know that Defendants' representations were false.

"27. Despite Defendants' many representations to me that my damages were caused by contaminated materials, and that they were pursuing resolution of my claims with the responsible chemical manufacturer, such representations were false. Mr. Britton testified in deposition in this case that he concluded in 2016 that my damage was caused by disease (eutypa) and that he did not observe any spray damage in my vineyards;[6] Buttonwillow's 'person most knowledgeable,' Mr.

---

[5] This letter was attached to Skouti's declaration.

[6] Britton does not dispute he testified "the damage he observed to [Skouti]'s vineyards in 2016 was the result of disease (eutypa) and not spray damage . . . ."

9.

Crowder, testified in deposition in this case that Buttonwillow believed that my damages were caused by misapplied chemicals and that Buttonwillow advised me of that conclusion in 2018.[7]

"28. I did not know that Defendants' representations to me were false until after the filing of this litigation. But for Buttonwillow and Mr. Britton inducing me to believe that they were not responsible for my damage, and that they were pursuing recovery on my behalf, I would have filed litigation against them years earlier. This is true even though it would have made it extremely difficult to obtain another chemical supplier."

On April 19, 2022, the superior court conducted a hearing on both summary judgment motions. In a written ruling dated May 4, 2022, the court granted the motions, concluding "more than three years has passed since the accrual of plaintiff's property damage claim, which is also more than two years since the accrual of plaintiff's breach of contract claim on the same facts," and "defendants are not equitably estopped from asserting a statute of limitations defense."[8] Judgment in favor of Britton was filed June 14, 2022. Judgment in favor of Buttonwillow was filed September 19, 2022.

## DISCUSSION

### I. Overview of summary judgment law

Summary judgment "provide[s] courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*); see *Lee v. Marchetti* (1970) 4 Cal.App.3d 97, 99 [" 'The salient philosophy behind this procedural device is to provide a method for the prompt disposition of actions and proceedings which have no merit and in which there is no

---

[7] At a January 18, 2022 deposition, Crowder testified he advised Skouti in the spring of 2018 that (1) Britton and a representative of the chemical manufacturer inspected Skouti's crops; and (2) the chemical manufacturer "felt that the product was misapplied" and "there was no failure of the product to do what it was supposed to do."

[8] The court also concluded equitable tolling of the statute of limitations did not apply. Skouti does not raise the issue of equitable tolling on appeal.

triable material issue of fact . . . .' " (italics omitted)].) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining if the papers show that there is no triable issue as to any material fact, the court shall consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact." (§ 437c, subd. (c).)

A defendant seeking summary judgment bears an initial burden to produce evidence demonstrating either one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (§ 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at pp. 849–850, 854–855.) "The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is heavier than the burden to show one or more elements of the plaintiff's cause of action cannot be established." (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289.) "Instead of merely submitting evidence to negate a single element of the plaintiff's cause of action, . . . 'the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense' [citations]." (*Ibid.*, italics omitted; see *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878–879 [preponderance of the evidence standard of proof].)

If the defendant makes a prima facie showing, then the burden of production "shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(2).) Specifically, where the defendant raises an affirmative defense, "the burden shifts to the plaintiff to show there is one or more triable issues of material fact regarding the defense after the

11.

defendant meets the burden of establishing all the elements of the affirmative defense." (*Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1484; see *Vahle v. Barwick* (2001) 93 Cal.App.4th 1323, 1328 ["The plaintiff need not produce any evidence until the defendant has established every element of his or her defense."].) "The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(2); accord, *Aguilar*, *supra*, at p. 849.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, *supra*, at p. 850, fn. omitted.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion[9] that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar*, *supra*, 25 Cal.4th at p. 850, fn. omitted.)

## II. Standard of review

"When reviewing the grant of a motion for summary judgment or summary adjudication, we independently consider whether a triable issue of material fact exists and whether the moving party is entitled to summary judgment or adjudication as a matter of law." (*Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 631, fn. omitted.) "In other words, we must assume the role of the trial court and reassess the merits of the motion. [Citation.] In doing so, we will consider only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.)

---

**9** Whereas a burden of production entails only the presentation of evidence, a burden of persuasion entails the establishment of a requisite degree of belief by way of such evidence. (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

"We apply the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond. Second, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in the moving party's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable issue of material fact." (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493–494.) "Our obligation is ' " 'to determine whether issues of fact exist, not to decide the merits of the issues themselves.' " ' [Citation.] We must ' "consider all of the evidence" and "all" of the "inferences" reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party.' [Citations.]" (*See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889, 900; see *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [" 'We accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' "].)

"Because summary judgment is a drastic measure that deprives the losing party of trial on the merits" (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304), "[a]ny doubts about the propriety of granting a summary judgment motion must be resolved in favor of the party opposing the motion" (*ibid.*).

## III.  Analysis

"An affirmative defense, the statute of limitations exists to promote the diligent assertion of claims, ensure defendants the opportunity to collect evidence while still fresh, and provide repose and protection from dilatory suits once excess time has passed." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) "The duration of the limitations period marks the legislatively selected point at which, for a given claim, these considerations surmount the otherwise compelling interest in adjudicating on their

merits valid claims." (*Ibid.*) "The limitations period, the period in which a plaintiff must bring suit or be barred, runs from the moment a claim accrues." (*Ibid.*; see § 312.) "A cause of action accrues 'when [it] is complete with all of its elements'—those elements being wrongdoing, harm, and causation." (*Pooshs v. Philip Morris USA, Inc.* (2011) 51 Cal.4th 788, 797.)

"A defendant moving for summary judgment based on the affirmative defense of the statute of limitations carries its burden by presenting evidence establishing that the plaintiff's claim is time-barred." (*Genisman v. Carley* (2018) 29 Cal.App.5th 45, 49.) " 'It then falls to plaintiff[] to counter with evidence creating a dispute about a fact relevant to that defense.' [Citation.] That is, the plaintiff must submit evidence that would allow a 'reasonable trier of fact [to] find in plaintiff['s] favor on the statute of limitations issue.' [Citations.]" (*Ibid.*)

In the instant case, Skouti raised causes of action for breach of oral contract and negligence. "The statute of limitations on a claim for a breach of an oral contract is two years . . . ." (*Lucioni v. Bank of America, N.A.* (2016) 3 Cal.App.5th 150, 164, citing § 339.) "A negligence claim involving damage to real property is governed by a three-year limitations period . . . ." (*Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112, 119, citing § 338, subd. (b); see *Stauffer Chemical Co. v. Superior Court* (1968) 265 Cal.App.2d 1, 3 ["The general rule is that growing crops are a part of the realty as long as unsevered."].) Skouti appears to concede he did not file his lawsuit within either applicable limitations period. Instead, he contends defendants are "estopped from asserting a statute of limitations defense." (Boldface, underlining & some capitalization omitted.)

"A defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied on by the plaintiff, has induced the plaintiff to postpone filing the action until after the statute has run." (*Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 652; see *Carruth v. Fritch* (1950) 36 Cal.2d 426, 433 [" 'One cannot justly or equitably lull his

adversary into a false sense of security, and thereby cause his adversary to subject his claim to the bar of the statute of limitations, and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought.' "].)

" ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' [Citation.]" (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37.) "Where one of the elements is missing, there can be no estoppel." (*In re Marriage of Thompson* (1996) 41 Cal.App.4th 1049, 1061.) "It is not necessary that the defendant acted in bad faith or intended to mislead the plaintiff." (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 43 (*Shaffer*).) "It is sufficient that the defendant's conduct in fact induced the plaintiff to refrain from instituting legal proceedings." (*Ibid.*)

" '[T]he estoppel cases appear to fall roughly into three classes: (1) Where the plaintiff is aware of his cause of action and the identity of the wrongdoer, but the latter by affirmative acts induces the plaintiff to refrain from suit. (2) Where the plaintiff is unaware of his cause of action and his ignorance is due to false representations by the defendant. (3) Where the plaintiff is unaware of the identity of the wrongdoer and this is due to fraudulent concealment by the defendant.' [Citation.]" (*Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 690.) " '[W]hether an estoppel exists—whether the acts, representations or conduct lulled a party into a sense of security preventing him from instituting proceedings before the running of the statute, and whether the party relied thereon to his prejudice—is a question of fact and not of law.' [Citations.]" (*Shaffer*, *supra*, 17 Cal.App.4th at p. 43.)

We conclude there was a triable issue of material fact as to whether defendants were equitably estopped from invoking the aforementioned statutes of limitations. The

parties do not dispute Britton applied a tank mix of chemicals to Skouti's vineyards in the summer of 2016; Skouti became aware of spray damage to his vines by the end of July 2016 or the beginning of August 2016; Skouti promptly notified defendants about the damage; and defendants arranged for the chemical manufacturer to inspect the vineyards. According to Skouti's declaration, Buttonwillow and its employee Britton maintained the cause of the spray damage was a product defect, i.e., contaminated chemicals, and they would seek reimbursement from the manufacturer on his behalf. Defendants assured Skouti during a meeting in late 2016 or early 2017, various meetings throughout 2018, and the final meeting in early 2019 that Britton was pursuing recovery for him. (Cf. *Lobrovich v. Georgison* (1956) 144 Cal.App.2d 567, 573 [delay in commencing action "not induced by any representation of defendant that an amicable settlement would be reached"].) At these same meetings, defendants reminded Skouti he had "difficulties . . . obtaining farming chemicals following [his] earlier crop loss lawsuits," "had essentially run out of chemical supply companies that [he] could hire to obtain agricultural chemicals," and "needed to be careful or [he] would find [him]self without a chemical supplier." (See *Ateeq v. Najor* (1993) 15 Cal.App.4th 1351, 1357 [equitable estoppel applied where the defendant caused the plaintiff to delay filing a lawsuit by threatening to have him deported].) In early 2020, by which point the statutes of limitations for Skouti's causes of action had run, Skouti contacted Buttonwillow stating he had not pursued a claim for the 2016 crop losses because of Buttonwillow's promise to obtain relief on Skouti's behalf with the chemical companies and that he did not have the resources to pay his current account, but would continue to pay cash for future purchases. Thereafter, Buttonwillow ended its business relationship with Skouti. In July 2020, Skouti filed the instant lawsuit. In subsequent depositions, both Buttonwillow and Britton indicated a product defect was not the cause of the damage to Skouti's crops. Viewing the evidence in the light most favorable to Skouti, a reasonable trier of fact could find defendants made the foregoing representations with the intent to induce Skouti

16.

to refrain from suing; Skouti relied upon these representations to his detriment; and Skouti did not become aware that defendants did not believe a product defect was the cause of his crop damage and did not pursue reimbursement on his behalf until after the filing of the lawsuit. (See *Carruth v. Fritch*, *supra*, 36 Cal.2d at p. 434 ["[The plaintiff] refrained from bringing an action until after the period of limitation, because she was induced to believe that she would be fully compensated for all medical expenses and loss of salary without litigation. However, these promises were made with no intention that they would be performed."]; *Shaffer*, *supra*, 17 Cal.App.4th at p. 44 ["[The plaintiffs] delayed bringing an action in reliance on [the] defendants' promises that the property damage would be repaired. Where [the] defendants failed to fulfill that promise—indeed where the evidence suggests [the] defendants never intended to perform—the jury could reasonably find that [the] defendants were estopped to assert a limitations defense . . . ."].) Hence, the trial court erred by granting the summary judgment motions.

## DISPOSITION

The judgments of the superior court are reversed. Costs on appeal are awarded to plaintiff and appellant Ahmad Skouti.


DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.

17.